# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 10 2020, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

An.G. and A.G. *(Minor Children)*,

and

A.G. *(Mother)*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

January 10, 2020

Court of Appeals Case No.
19A-JT-1272

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Judge

Trial Court Cause Nos.
45D06-1812-JT-353
45D06-1812-JT-354

**Robb, Judge.**

# Case Summary and Issue

[1] A.G. ("Mother") appeals the termination of her parental rights to her two children and presents the sole issue of whether the juvenile court's order terminating her parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother is the biological mother of An.G., born April 23, 2016, and Al.G.,[1] born March 23, 2018 (collectively "Children").

[3] On July 10, 2017, the Indiana Department of Child Services ("DCS") received a report alleging that Mother had physically abused An.G., her then fifteen-month-old child. An.G. had been brought to St. Catherine's Hospital severely injured and without parents. Amanda Cruze, DCS assessment worker, went to the hospital where she observed blood in An.G.'s nose and bruising on her temple. An.G. was unable to move in the bed; "[s]he just laid there." Fact Finding Hearing ("Transcript"), Volume II at 17. She refused to eat or drink and did not want to be picked up. If touched, An.G. would scream. An.G. was diagnosed with fractures to the tibia and fibula of her left leg, as well as a

---

[1] The official designation of this case is In the Termination of the Parent-Child Relationship of An.G. and A.G. and Mother. We have referred to A.G. as Al.G. in this opinion.

brain bleed. In addition, An.G. was underweight, weighing only sixteen pounds at the time.

[4] Cruze called Mother several times and police visited her home, where she lived with her step-father, Gene Hill, and Gene's mother. However, Mother was unable to be reached or located. The next day, An.G. was transferred to Riley Hospital and underwent additional medical testing, which revealed a skull fracture, four rib fractures, finger fractures, and three spinal fractures. An.G. was born with a severe liver condition[2] and DCS' assessment revealed that An.G. had been an in-home child in need of services ("CHINS") from October 2016 through February 2017 based on medical neglect by Mother. Specifically, Mother had failed to take An.G. to her scheduled medical appointments in order to secure An.G. a spot on the transplant list. As part of the 2016 case, Mother completed a parenting assessment and took An.G. to her scheduled appointments during the relevant time frame. DCS closed the case in February 2017.

[5] On July 11, 2017, DCS filed a petition alleging An.G. to be a CHINS. Due to inadequate service of process on Mother, the juvenile court continued the initial detention hearing and ordered that An.G. remain in temporary custody of DCS. On August 1, 2017, Cruze spoke with Mother about the allegations.

---

[2] An.G. was born with biliary atresia "which means [her] bile ducts are not functioning correctly so bile builds up in her liver which infuses toxins into her body." Exhibits at 20. If untreated, the condition is life threatening.

During their conversation, Mother admitted that she punched An.G. three or four times "thinking she [w]as a pillow" and then stopped. *Id*. at 19. DCS recommended that Mother complete a parenting assessment and follow all recommendations; complete parenting education and a clinical assessment; participate in therapy; and engage in homebased casework. *See* Exhibits at 27-28. Following a liver transplant in August 2017, An.G. was placed in foster care. Around the same time, Mother began meeting with an individual therapist twice each week.

[6] On November 15, 2017, the juvenile court held a pretrial hearing during which Mother admitted to the allegations in the CHINS petition. The juvenile court adjudicated An.G. a CHINS, adopted DCS' recommended parent participation plan, and also ordered Mother to complete a substance abuse assessment, follow recommendations, and submit to random drug screens.

[7] On March 23, 2018, during An.G.'s CHINS case, Mother gave birth to Al.G. The next day, DCS received a report that Mother tested positive for marijuana at the time of Al.G.'s birth. Mother admitted to smoking marijuana three weeks prior to Al.G.'s birth and three times[3] during her pregnancy. Al.G. tested positive for THC. On March 25, Stephanie Gonzales, DCS family case manager, met with Mother at the hospital where she read her the allegations

---

[3] It is unclear whether Mother's marijuana use three weeks prior to Al.G.'s birth is included in her admission that she smoked marijuana three times during her pregnancy.

contained in the report. Mother admitted the allegations and the two spoke briefly about the open CHINS case regarding An.G.

[8] Due to Mother's non-compliance with the open CHINS case, the severity of An.G.'s injuries, and Mother's substance abuse, DCS recommended that Al.G. be placed outside of Mother's care. At an initial detention hearing, the juvenile court found out of home placement to be in Al.G.'s best interests. The juvenile court ordered Mother to continue with services that had been ordered in the open CHINS case of An.G., submit to random drug screens, and participate in supervised visitations with Al.G. On March 27, Al.G. was removed from Mother's care and placed in foster care. The same day, DCS filed a petition alleging Al.G. was a CHINS. The juvenile court held a hearing on June 11, 2018, during which Mother made a "general admission" that Al.G. was a CHINS and the juvenile court adjudicated her as such. Exhibits at 64. Mother was ordered to complete a psychological evaluation, submit to random drug screens, and attend supervised visitation with Al.G.

[9] In an August progress report, DCS reported that Mother has been non-compliant with individual therapy and homebased casework, and inconsistent with supervised visitation and in submitting to drug screens. DCS further reported that Mother refuses to utilize homebased casework even though she is in need of housing and employment. In September 2018, Mother's therapist took a full-time position elsewhere and transferred Mother's individual therapy service, but Mother stopped attending therapy at this time and never returned.

On September 17, the juvenile court issued an order changing Children's permanency plan from reunification to adoption. *Id*. at 79-84.

[10] In November, DCS filed another progress report detailing Mother's non-compliance with services: Mother has met with her therapist only once in recent months and has not made any therapeutic progress; Mother has "continually cancell[ed] visits," arrived twenty to thirty minutes late, or failed to show for supervised visits with Children; she has only met with her homebased caseworker once since September; Mother's compliance with the drug screens has been inconsistent; and Mother has only attended one of An.G.'s weekly medical appointments despite ample opportunity to attend others. *Id*. at 90.

[11] On December 14, 2018, DCS filed its verified petition to terminate Mother's parental rights. Appellant's Appendix, Volume 2 at 16-18.[4] Although Mother was required to submit to two drug screens each week, she only submitted to six between November 30, 2018 and January 25, 2019. In the fall of 2018 and in January of 2019, Mother tested positive for methamphetamine. In a March 2019 progress report, DCS reported that Mother continues to be non-compliant with all services.

---

[4] As the State points out, Mother failed to include DCS' petition to terminate Mother's parental rights to Al.G. and the chronological case summary in her Appendix.

[12]     A fact-finding hearing was held on April 25, 2019 during which Mother appeared via telephone.[5] Following the hearing, the juvenile court entered an order terminating Mother's parental rights and found, in pertinent part:

> Mother was sporadic with her attendance in her participation with the service providers. Mother lived with her stepfather and others and would not actively participate in her counseling sessions when they were conducted in the home. It was believed that stepfather was abusive towards [M]other. There is also alleged drug usage in the home. Mother could not obtain mental stability while residing in the home with the abuser.
>
> The therapy sessions were then moved to an agency in an effort to engage Mother. Mother initially became engaged and her participation increased. It was discovered that [M]other was abused and did not have a good relationship with either of her parents. Mother was then abusive to her [C]hildren due to her learned behaviors. The therapist attempted to help [M]other process the trauma, teach [her] to become attached, teach [her] coping skills, and build up [her] self-esteem. Mother was not consistent with the therapy offered and it was difficult for [M]other to overcome the past trauma due to her lack of attendance and participation. It was determined that [M]other would need several years of therapy in order to adequately parent any children. Mother has a long history with abuse that negatively affects her parenting skills. Mother also has severe attachment issues [and] voluntarily stopped all participation in the therapy since September of 2018. Due to [M]other's lack of participation in the therapy, the [C]hildren's safety would be at

---

[5] Mother had car trouble and was unable to physically appear at the fact-finding hearing. Mother's counsel was present at the hearing and the juvenile court allowed Mother to participate via telephone.

risk if placed in [M]other's care because [her] erratic behavior is likely to persist.

. . . [An.G.] does not have any significant bond with her [M]other. [An.G.] needs constant and consistent medical care which she is . . . unlikely to receive if placed with her [M]other because [M]other doesn't follow through when she is required to. . . .

Mother has not completed the parenting education [but] was given hands-on parenting at the visitations in an effort to teach [her] to properly parent the [C]hildren. Mother continues to have to be redirected at the visits and does not understand [An.G.]'s medical needs nor does [M]other follow the strict diet that [An.G.] has to be on. Mother continues to cancel her visitations [and] . . . is unable to complete the service or participate in the service. Mother did not speak to the [C]hildren and would often just stare at the [C]hildren. Mother had to be redirected at the visitations for the safety of the [C]hildren. Mother's visitations did not progress. Mother would leave the room with her [C]hildren unsupervised. The service provider had to have a constant watch on [M]other even after two years, due to [M]other's unpredictable behaviors with the [C]hildren. . . .

Home based casework services were offered to [M]other in an effort . . . to gain independent housing away from her abusers. Mother did not participate nor did she ever obtain independent housing.

Although [M]other somewhat participated in the services offered, they were always sporadic and no progress has been made in reunifying with her [C]hildren. Mother is non-compliant and sporadic with submitting to her drug screens. Mother has tested positive for methamphetamines on her screen in January of 2019

and another in the fall of 2018.  Mother has not attended the CHINS review hearings . . . since September of 2018.

Mother has not participated in the medical care for [An.G. and] has not attended the medical appointments . . . and always has a variety of excuses of why she is unable to attend. . . .

* * *

Due to none of the fathers being interested in parenting these [C]hildren and [M]other's non-compliance with the case plan, [her] lack of progress in her parenting skills, [her] unsafe and unstable housing, and [her] lack of gaining mental and emotional stability, the [C]hildren's placement with a parent is unlikely to be obtained in the near future.  After two years, [M]other is not any closer to reunification with her [C]hildren.  All efforts to engage [M]other have failed.

[Mother] is [not] providing any emotional or financial support for the [C]hildren[,] has [not] completed any case plan for reunification[, and] is [not] in a position to properly parent these [C]hildren. . . .

The [C]hildren remain outside of [Mother]'s care.  The original allegations of neglect have not been remedied[. Mother has not] demonstrated an ability to independently parent the [C]hildren and provide the necessary care, support and supervision.  There is no basis for assuming [she] will complete the necessary services and find [herself] in a position to receive the [C]hildren into the home.  [Mother] failed to utilize the available services and make the necessary efforts to remedy the conditions, which led to intervention by DCS and the Court.

> The [C]hildren continue to reside in stable foster homes which has indicated both a willingness and ability to adopt both [C]hildren. It would be unfair to the [C]hildren to delay such permanency on the very remote likelihood of [Mother's] committing to and completing services.

Appealed Order 2-3. Based on these findings, the juvenile court concluded that there is a reasonable probability that the conditions that led to Children's removal and continued placement outside of Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Children's well-being. The juvenile court also concluded that termination of Mother's parental rights is in Children's best interest and DCS has a satisfactory plan for Children, namely adoption. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* The law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake*

*Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[14] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[15] The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains

no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Statutory Framework for Termination

[16] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However,

because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements in that subsection has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## A. Remedy of Conditions

[17] First, we note that Mother does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Mother challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that led to Children's removal and continued placement outside of Mother's care will not be remedied. Mother maintains that the juvenile court "failed to look at the obvious fact that [she] had mental health issues" and argues that she substantially complied with the case plan. Brief of Appellant at 12. We disagree.

[18] We engage in a two-step analysis to determine whether such conditions will be remedied: "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). Here, An.G. was removed from Mother's care due to physical abuse and neglect by Mother. Al.G. was removed due to Mother's substance abuse issues, An.G.'s open

CHINS case, and the extent of An.G.'s injuries. After removal, Children remained outside of Mother's care due to her instability and inability to safely and effectively parent the Children.

[19] With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[20] The evidence in the record reveals that Mother failed to comply with the parent participation plan. Mother was ordered to participate in individual therapy on a weekly basis. Ellen Minter, therapist with Northstar, began working with Mother in July 2017 and worked with her for almost one year. Initially, Mother engaged in therapy twice each week at Mother's home. At some point, visits were moved to Minter's office and Mother's compliance increased.

Mother's compliance again increased after the emergency hearing regarding Al.G. However, Mother ultimately stopped therapy in September 2018. When asked whether Mother was compliant with therapy, Minter testified, "No. Sometimes. I mean she met when she wanted to." Tr., Vol. II at 30. She explained, "Sometimes [Mother] would cancel, sometimes she wouldn't be there. It just depends, . . . I [would] call every week, hey are we meeting this week. Sometimes she would say no, sometimes she would [say] yeah. It just depended on what she wanted to do[.]" *Id.*

[21] It took Mother about six months to open up to Minter, which is not unusual. Once Minter built a rapport with Mother, she learned that Mother suffers from past trauma, which affects her ability to parent. Minter testified that if Mother does not address her trauma, she will continue to be abusive to those she loves. With respect to progress, Minter stated that with the level of trauma suffered by Mother, not much progress could be made in one year, but she believed Mother had made some progress – albeit slow. Mother progressed in processing her trauma but "[i]n the other areas of her life, progress was not being made[,]" *id.* at 40., and Minter "felt that [Mother] would need progressive years of therapy before she [would be] ready to be able to parent effectively[,]" *id.* at 35. In September 2018, Minter obtained a full-time job elsewhere and transferred Mother's services, but Mother never engaged in therapy after Minter left. At some point, Mother completed the intake for the psychological assessment; however, she failed to complete the recommended evaluation to determine whether she had any underlying mental health needs.

[22]    Christina Thomas, caseworker at Northstar, received a referral for supervised visitations, parenting education, hands-on parenting, and homebased casework for Mother. At the fact-finding hearing, Thomas testified that Mother's attendance at visits was inconsistent. She stated that Mother attends more of An.G.'s visits than Al.G.'s, and Mother cancels more than half of those with Al.G. and was not prepared for visits she did have with Al.G. "Sometimes when we have court hearings, [Mother will] increase her attendance, but then it wains [sic] back off . . . until the next court date." *Id*. at 61.

[23]    In March 2018, Lisa Sternberg, DCS case manager, began working with Mother. She testified that Mother has been "very inconsistent" with supervised visitation. *Id*. at 46. Since the beginning of April 2019, Mother has only attended five visits despite the opportunity to attend as many as three visits each week. Sternberg explained that Mother would often cancel, no show, or leave the visits early, citing her work schedule.

[24]    Thomas described Mother's behavior during visits as unpredictable and often impulsive; Mother "acts more like an older sibling than mom. She taunts and provokes misbehavior at times." *Id*. at 63. In working with Mother, Thomas and Sternberg both had to constantly redirect Mother. On one occasion, after An.G. had surgery, Thomas instructed Mother *not* to pick An.G. up because she had forty-two staples in her abdomen; however, the first thing Mother did was reach down to pick An.G. up. Ultimately, Thomas opined that Mother is incapable of predicting safety issues and as a result, she had to intervene for the safety of the Children.

[25]     The record also reveals that Mother has failed to remedy her substance abuse issues. Mother completed the substance abuse assessment, which recommended drug screens and therapy. However, Mother has not been consistent in submitting to the required twice weekly drug screens and Mother did not participate in substance abuse therapy, which was "supposed to be somewhat included with the [individual] therapy" but she had not participated in individual therapy since September 2018. *Id.* at 47. Although Mother's most recent drug screen on April 1, 2019 was negative, she has had "multiple positive screens for marijuana; marijuana and alcohol; and she had two screens for methamphetamines[,]" one in January of 2019 and one in the fall of 2018. *Id.* at 46. DCS used Mother's compliance with her drug screens as a way of determining whether Mother would be able to keep up with An.G.'s strict medication routine. Mother did not comply with the random drug screens as she often failed to call in each morning, as required.

[26]     Sternberg testified that since Children's removal, Mother has failed to provide them with any financial or emotional support, and Mother has not completed any of her case plan toward reunification. Sternberg's ongoing concerns with Mother include Mother's non-compliance with services, failure to complete any case goals, and inability to parent and bond with Children. Sternberg further testified that the reasons for DCS' involvement in this case have not been remedied and that Mother's inconsistency in engaging in services is preventing her from moving forward.

[27] Mother has also failed to attend An.G.'s medical appointments. "Mother has not . . . shown any type of initiative to attend medical appointments. [DCS has] given her multiple chances . . . [and s]he's only attended one visit with [An.G.'s] liver team[,]" in October 2018. *Id*. at 50. In addition, Mother did not engage in a single wellness or dental appointment.

[28] Mother's housing situation, which has remained unchanged, was problematic and posed a safety concern for the Children. Sternberg explained that although Mother has maintained housing throughout this case, it is not an appropriate or suitable place for the Children. She further stated that there were safety concerns in the house because the night Mother injured An.G., no one in the house protected An.G. and there were reports of abuse and drug issues in the home. At a team meeting in September 2018, Mother's stepfather, Hill, was allegedly in the basement of the home consuming drugs. In addition, Minter opined that Hill was abusive toward Mother. "He triggered her a lot, her anger, very manipulative with her. She didn't have much stability if she didn't do what he wanted, he would kick her out." *Id*. at 32. In working with homebased services, one of Mother's goals was to obtain her own house or apartment but Mother was not compliant with these services and she failed to achieve her housing goal as she remains in the same home with Hill.

[29] The juvenile court found that all services to engage Mother have failed. Thomas and Sternberg both testified that there was nothing else DCS or the other service providers could have done to help Mother reunify with Children. Thomas stated that she would encourage Mother to make wise choices, but

Mother does not take her advice. Thomas explained, "[F]or two years, I've been hoping for that change, . . . [b]ut, despite my efforts, I haven't seen a change, so I don't see it happening any time soon." *Id*. at 66. Although Thomas would expect Mother to have progressed from supervised visits given the length of time she has been working with Mother, she would not recommend that Mother have unsupervised visits. In fact, Thomas testified that Mother is not in a condition to safely parent Children and even recommended reduced visits.

[30] We have often noted that evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang*, 861 N.E.2d at 372. Such is the case here. There is ample evidence in the record establishing Mother's non-compliance with the case plan, preventing her from making any progress toward reunification. Therefore, we agree with the juvenile court that the evidence establishes a reasonable probability that the conditions resulting in Children's continued placement outside of Mother's care will not be remedied. *See, e.g., In re E.M.*, 4 N.E.3d at 644 (findings regarding a parent's continued non-compliance with services supported juvenile court's conclusion the conditions under which children were removed from the parent's care would not be remedied).

## B. Best Interests

[31] Mother also takes issue with the juvenile court's conclusion that termination of her parental rights is in Children's best interests. Mother contends that the

juvenile court "failed to address the pain and suffering that the [C]hildren will indeed experience when they realize that they will not have any further contact with their Mother." Br. of Appellant at 14.

[32]     To determine the best interests of children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. "A child's need for permanency is an important consideration in determining the best interests of a child[.]" *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[33]     The record reveals that An.G. was removed from Mother's care at fifteen months old and Al.G. was removed at four days old. Since removal, Children have not returned to Mother's care due to Mother's non-compliance with services, instability, and inability to safely parent Children. At the fact-finding hearing, Sternberg testified that she believes termination of Mother's parental rights and adoption is in Children's best interests. With respect to An.G.'s medical needs, Sternberg explained some of her concerns given Mother's non-compliance and inability to parent:

> [W]e have given [Mother] aptitude (sic) opportunities to go to [An.G.'s medical] appointments. . . . [M]other knows of [An.G.'s] condition and some of the concerns, however, because [M]other has not been there for the last almost two years now, a lot of things have changed in her medical history. . . . [T]he

medication is very strict [and] . . . [An.G.'s] Medicaid has to always stay active. Sometimes the pharmacies in the area cannot do her medications, so that means you have to do a random trip the next morning down t[o] Riley[] to get the prescription refilled. So, the transportation would be an issue. Making sure the Medicaid is . . . up to date. We have also attempted with [M]other to see if . . . [An.G.] was back in her care, how she could remember and be able to be consistent with the medi[c]ations. We offered [Mother] an opportunity to use [her] drug screens as an opportunity to be consistent. Make sure every morning [she is] up at 8am, [she] call[s] right at 8am to show that [she] could call in, which would mean that's when [she's] waking up to give [An.G.] her medicine, and [M]other has failed to do that. As she's non-compliant with her screens and she does not call in daily.

Tr., Vol. II at 51-52. Therefore, given Mother's lack of progress, she is not in any condition to be able to provide An.G. with the proper medical care she requires or provide Children with other necessary care. It is clear that Mother is unable to independently parent the Children or provide An.G. with the requisite medical care, and she has failed to remedy her instability and substance abuse issues. And, as the juvenile court noted, Children need and deserve permanency and "[i]t would be unfair to the [C]hildren to delay such permanency on the very remote likelihood of [Mother] committing to and completing services." Appealed Order at 3. The evidence in the record supports the juvenile court's conclusion that, based on the totality of the evidence, termination of Mother's parental rights is in Children's best interests.

# Conclusion

[34]    We conclude that DCS presented clear and convincing evidence to support the juvenile court's judgment terminating Mother's parental rights and therefore, the juvenile court's order was not clearly erroneous.  Accordingly, we affirm.

[35]    Affirmed.


Bradford, C.J., and Altice, J., concur.